# In the United States Court of Federal Claims

No. 20-1160C
(Filed Under Seal: October 29, 2020)
(Reissued for Publication: November 16, 2020)[*]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| BLUEWATER MANAGEMENT GROUP, LLC, | * |
| | * Postaward Bid Protest; Lodging |
| | * Management Services; Tiered Set-Aside; |
| Plaintiff, | * Motion to Dismiss; Standing; Cross- |
| | * Motions for Judgment on the Administrative |
| v. | * Record; Discussions; Evaluation of |
| | * Technical Approach and Performance Risk; |
| THE UNITED STATES, | * Compliance With Solicitation's Evaluation |
| | * Scheme; Permanent Injunction |
| Defendant. | * |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Daniel J. Strouse, Arlington, VA, for plaintiff.

Christopher L. Harlow, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Senior Judge

In this postaward bid protest, plaintiff Bluewater Management Group, LLC ("Bluewater") challenges the award of a lodging management services contract by the United States Department of Veterans Affairs ("VA") to Brian Hall Properties ("Brian Hall"). Specifically, Bluewater alleges that the VA improperly engaged in discussions with Brian Hall and erred in its evaluation of Brian Hall's revised proposal. Before the court are defendant's motion to dismiss the protest for lack of standing and the parties' cross-motions for judgment on the administrative record. As explained below, the court denies defendant's motions, grants Bluewater's motion, and enters a permanent injunction.

## I. BACKGROUND

### A. The Solicitation

On April 16, 2020, the VA issued a solicitation to procure lodging management services to provide overflow lodging for students at the VA Law Enforcement Training Center ("LETC")

---

[*] This reissued Opinion and Order incorporates the agreed-to redactions proposed by the parties on November 6, 2020. The redactions are indicated with bracketed ellipses ("[. . .]").

in North Little Rock, Arkansas.  Administrative R. ("AR") 110, 116.  The VA specified that it intended to award a firm-fixed-price contract for one base year and one option year.  Id. at 110, 115, 117.  The contract was set aside for a service-disabled veteran-owned small business ("SDVOSB"), veteran-owned small business ("VOSB"), or a small business.  Id. at 110, 128-33.

Pursuant to the solicitation's Performance Work Statement, the contractor was required to provide daily lodging "for up to 300 students within a 7-mile radius" of the LETC.[1]  Id. at 116; accord id. at 188 (reiterating that the LETC could have "as many as 300 people at one time that would require lodging" and emphasizing "that the 7-mile radius applies").  However, the radius could be extended to twelve miles with the approval of the contracting officer's representative.  Id. at 117; accord id. at 191 ("The radius for this requirement is 7 miles.  The 12-mile radius is an administrative allowance during performance to permit temporarily providing lodging in special circumstances.  All offers should include only hotels within a 7-mile radius.").  The contractor was to use, "to the greatest extent possible," a single lodging facility that was "deemed to be the primary lodging facility," with any secondary lodging facilities to "be within the general proximity of the primary facility."  Id. at 118; accord id. at 186, 188.  In addition, all proposed lodging facilities were to meet a variety of requirements related to room quality, amenities, cleanliness, safety and security, and parking.  Id. at 119-20.  With respect to the "safety and security" requirement, "[l]odging providers" were to "demonstrate policy and procedure implemented to provide for the physical safety and security of [their] patrons, i.e.[,] security guards, video surveillance and well-lit parking."  Id. at 120.  With respect to amenities, "[t]he Contractor [was to] ensure all of the following [were] provided:  Single Occupancy," "Telephone Services for Local Calls," "Iron & Ironing Board," "Television W/ Remote," "Coffee Pot," "Microwave," "Refrigerator," "Daily Housekeeping Service," "Laundry Facility on Premises," "Complimentary Internet Access," "Complimentary Parking," "Complimentary Hot Breakfast (Preferred)," and "On Dining Facility (Preferred)."  Id. at 119.  Finally, offerors would be responsible for reserving the rooms and providing the VA with reports regarding the number of rooms used, which students had checked in, and early check-outs.  Id. at 118.

Offerors were required to submit their proposals in four volumes:  (1) Technical Approach; (2) Performance Risk; (3) Price; and (4) SF1449, Certifications, and Amendments.  Id. at 152-55.  The Technical Approach volume was to include an explanation of how the lodging requirements set forth in the Performance Work Statement would be satisfied, how the offeror would manage its reservation and reporting responsibilities, rating information for each proposed lodging facility, and signed letters of commitment from a representative of each proposed lodging facility indicating the number of rooms being committed.  Id. at 153; see also id. (noting "that facilities proposed by the vendor shall meet the criteria for all areas shown on the technical checklist").  The Performance Risk volume was to include the identity "of up to three contracts for which performance occurred during the five years immediately prior to the proposal submission date" that were "similar to the services of this requirement (size, scope, complexity)" and, for each identified contract, "a narrative explanation describing the scope and purpose of the contract and detailing how the effort is relevant to the requirements of this solicitation."  Id. at 154.  And the Price volume was to include a completed Pricing Schedule, id.

---

[1]  The VA did not specify whether the radius was measured as the crow flies or by driving distance.

at 155, specifying a daily room price for the base year and the option year, as well as the price for each year based on 35,000 room nights, id. at 115; see also id. at 117 (indicating that the daily room price should "cover the cost of the actual lodging and the lodging management service fee").

The VA advised potential offerors that it would evaluate proposals using a tiered approach starting with proposals from SDVOSBs (Tier 1), followed by proposals from VOSBs (Tier 2), and proposals from small businesses (Tier 3), with HUBZone small businesses and socially and economically disadvantaged small businesses given priority. Id. at 150, 156-57. After excluding proposals from offerors who were not properly certified as an SDVOSB, VOSB, or small business, the VA planned to evaluate "all remaining proposals for Technical Capability using a tiered approach based on an order of priority as established in 38 U.S.C. [§] 8127." Id. at 156; see also 38 U.S.C. § 8127(h) (providing that "[p]references for awarding contracts to small business concerns shall be applied in the following order of priority:" (1) "small business concerns owned and controlled by veterans with service-connected disabilities"; (2) "small business concerns owned and controlled by veterans" without service-connected disabilities; (3) small business concerns pursuant to sections 8(a) and 31 of the Small Business Act;[2] and (4) small business concerns "pursuant to any other small business contracting preference"). Specifically:

I. Tier 1 proposals will be evaluated first. After review of Tier 1 proposals, if award can be made at a fair and reasonable price that offers best value to the United States, no additional tiers will be reviewed. If no offers are submitted at Tier 1 or if none of the Tier 1 proposals would result in award at a fair and reasonable price that offers best value to the United States, the Government will evaluate Tier 2 proposals for award.

II. After review of Tier 2 proposals (if needed), if award can be made at a fair and reasonable price that offers best value to the United States, no additional tiers will be reviewed. If no offers are submitted at Tier 2 or if none of the Tier 2 proposals would result in award at a fair and reasonable price that offers best value to the United States, the Government will evaluate Tier 3 proposals for award.

III. If no offers are submitted at Tier 3 or if none of the Tier 3 proposals would result in award at a fair and reasonable price that offers best value to the United States, solicitation will be cancelled, and the requirement resolicited.

Each tier represents a distinct set-aside and will be evaluated in isolation.

---

[2] Section 8(a) of the Small Business Act authorizes a program for socially and economically disadvantaged small businesses. See Act of Oct. 24, 1978, Pub. L. No. 95-507, § 202(a), 92 Stat. 1757, 1761-63 (codified as amended at 15 U.S.C. § 637(a)). Section 31 of the Small Business Act authorizes the HUBZone program. See HUBZone Act of 1997, Pub. L. No. 105-135, tit. VI, § 602(b), 111 Stat. 2592, 2629-31 (codified as amended at 15 U.S.C. § 657a).

> If only one proposal is received and evaluated in a tier, the Contracting Officer
> may award to that offeror if the proposal meets the requirements of the
> solicitation and the proposed price is fair and reasonable . . . . If the proposal does
> not meet the requirements of the solicitation and the proposed price is not fair and
> reasonable . . . , the [Contracting Officer] will evaluate proposals received at the
> next tier.

AR 156-57.

With respect to the review of proposals within this tiered approach, the VA stated that it
would evaluate proposals "strictly in accordance with their written content." Id. at 157; accord
id. at 150-51 ("Contents of the written proposals will be evaluated to determine the degree and
extent to which the requirements set forth in the [solicitation] are satisfied."). It cautioned that
"[p]roposals which merely restate the requirement or state that the requirement will be met,
without providing supporting rationale, are not sufficient and will be rated Unsatisfactory and
thus, ineligible for award," id. at 157, and that a "[f]ailure to fully meet a material requirement
will render a quotation [sic] unacceptable, thus ineligible for award,"[3] id. at 151.

Turning to the criteria to be used in evaluating proposals, the VA advised potential
offerors that "[f]or each offer[] received," it would "evaluate Technical Approach, Performance
Risk, and Price." Id. at 150. For the Technical Approach factor, the VA would evaluate

> the extent to which [the offeror] meets or exceeds the lodging requirement
> including:
>
> a. (Understanding of the requirement)
>
> > How the offeror will satisfy the lodging requirements, including:
> > - Hotel(s) proposed,
> > - AAA Diamond level, star level, etc.,
> > - hotel amenities,
> > - distance from the LETC
> >
> > How the offeror will manage the administration/reporting process.
>
> b. (Feasibility of Approach)
>
> > Can the Vendor deliver on its offer? (Have the hotels proposed signed
> > letters of commitment including language confirming the number of

---

[3] The VA, presumably inadvertently, used the terms "quotation" and "quote" on several
pages of the solicitation, see, e.g., AR 151-52, 155, 157, but there is no question that it conducted
a negotiated procurement pursuant to Federal Acquisition Regulation ("FAR") part 15, see id. at
150.

required rooms will be made available to the offeror should it receive an award?)

Id. at 157.  The VA further indicated that it might "conduct site visits of any location proposed for lodging to determine [the] degree to which lodging requirements can be met."  Id.  For the Performance Risk factor, the VA would evaluate an offeror's experience ("the skill and knowledge gained by performing services") and past performance ("the degree to which [the] contractor satisfied its customers in the past and complied with Federal, State, and local laws and regulations") based on "performance examples" supplied by the offeror that were timely ("performed within the last five years") and relevant ("similar in size, scope, and/or complexity").  Id. at 158.  It also "reserve[d] the right to evaluate any other information available to it through the [Past Performance Questionnaires] or other available resources."  Id.  And, the VA would evaluate price "using competition, historical pricing, comparison to the Government's independent cost estimate, or through other permissible methods to determine reasonableness."  Id. at 159; see also id. at 1 (reflecting that the independent government cost estimate was [. . .] for the base year and [. . .] for the option year, for a total of [. . .]).  In evaluating proposals, the VA reserved the right to conduct discussions with offerors if it determined that discussions were "necessary."  Id. at 148 (setting forth FAR 52.212-1, which provides:  "The Government intends to evaluate offers and award a contract without discussions with offerors. . . .  However, the Government reserves the right to conduct discussions if later determined by the Contracting Officer to be necessary.").

To select the contract awardee, the VA would use a "best value, trade-off approach," id. at 150-51, in which it would consider the Technical Approach and Performance Risk factors to be "equally important" and, when combined, "more important than Price," id. at 150.  Ultimately, the contract would be awarded "based on the best overall proposal that is determined to be the most beneficial to the Government (i.e., best value)."  Id.; accord id. at 163 ("The Government will award a contract resulting from this solicitation to the responsible offeror whose offer conforming to the solicitation will be most advantageous to the Government, price and other factors considered.").

## B.  The Proposals

Proposals were due by April 28, 2020.  Id. at 183.  By that deadline, the VA received proposals from three SDVOSBs, including Brian Hall; one VOSB; and ten small businesses, including a potential HUBZone small business and Bluewater.[4]  Id. at 206-837; accord id. at 878; see also id. at 5, 191 (indicating that Bluewater was the incumbent contractor).

---

[4]  The only indications in the administrative record that one Tier 3 offeror is a HUBZone small business are the contents of the company's e-mail signature and letterhead, AR 632-34, 636; no documentation regarding the company's status as a HUBZone small business was included in its proposal, id. at 633-38.  In the absence of any evidence to the contrary, the court presumes that the company's representations are accurate.  However, if they are not accurate, Bluewater would not be prejudiced because, as set forth below, the apparent HUBZone small business offeror's proposal was materially noncompliant with the solicitation's requirements and therefore does not affect Bluewater's chance to be awarded the contract.

Brian Hall, in its Technical Approach volume, stated that it "worked diligently to exceed the basic requirements of the" solicitation. Id. at 207. It then identified nine primary hotels, representing that all were "within a 7-mile radius" of the LETC, giving it "access to approximately 400 rooms." Id. It also represented that it had agreements with a number of secondary hotels that were "within 7-12 miles" of the LETC. Id. at 207, 209; see also id. at 258 (identifying, in the Price volume, twenty hotels, their addresses, and a number labeled "miles" that ranged from "1.30" to "12.70"[5]). It provided commitment letters from twenty hotels (with six of the letters not indicating the number of rooms being committed and no letter at all from one of the identified primary hotels),[6] id. at 210-48, but did not describe any of the hotels' amenities or provide any of the hotels' ratings, id. at 207-09. In its Performance Risk volume, Brian Hall stated that it was "the #1 lodging provider for the Department of Homeland Security," that "[t]here are over 35 hotels that have trusted [it] to represent their lodging in Glynco, GA, home to the Federal Law Enforcement Training Center [("DHS FLETC")]," and that it "distributes more law enforcement lodging than [any] entity in the world." Id. at 250. It then identified four contracts to provide lodging for the DHS FLETC; for each contract, it indicated that the contract had a dollar amount of "$3,000,000+" and was performed by "5,000" personnel, and generically remarked:

> In the past three years, Brian Hall Properties has represented over 100 lodging contracts, and several million dollars in awards. Some entities we have represented include the Army, Navy, Air Force, FEMA, FLETC, USMS, TSA, ICE, ARNG, and many others. Brian Hall Properties is the #1 lodging provider for the Department of Homeland Security. Our company has the wherewithal, past performance, financial backing, and references to support your lodging needs.

Id. at 254-57. Finally, in its Price volume, Brian Hall proposed a daily room rate of [. . .], a price for the base year of [. . .], a price for the option year of [. . .], and a total price of [. . .]. Id. at 258.

The VOSB offeror, in its Technical Approach volume, identified one primary hotel and one secondary hotel, and provided a commitment letter from the hotels' management company. Id. at 437-42, 449. However, the VOSB offeror did not indicate that the hotels could provide 300 rooms per day. See id. at 434-43 (reflecting only that the secondary hotel had [. . .] rooms), 449 (providing that the two hotels "would agree to provide rooms at each hotel in support of the LETC student lodging needs as per the agreed terms," but failing to identify the number of rooms that the hotels committed to providing). In its Performance Risk volume, the VOSB offeror identified three contracts but did not provide any narrative descriptions for those

---

[5] It is unclear what the "miles" number actually represents. For example, based on a search using Google Maps, the hotel designated as "12.70 miles" is within a 7-mile radius of the LETC as the crow flies and, depending on the route, is within an 8.3-to-8.9-mile driving distance of the LETC.

[6] Brian Hall identified the [. . .] in North Little Rock as a primary hotel, AR 207, but provided a commitment letter from the [. . .] in North Little Rock, id. at 220.

contracts, instead including information regarding the contracts in three tables.  Id. at 445.  In its Price volume, the VOSB offeror proposed separate daily room rates for each hotel, with a price of [. . .] for the base year, a price of [. . .] for the option year, and a total price of [. . .].  Id. at 446.

The HUBZone small business offeror did not submit a multiple-volume proposal, but instead submitted two three-page proposals.  Id. at 631-38.  In one, it identified a single hotel, described some of the hotel's amenities, and proposed a daily room rate, id. at 636-38, and in the other, it identified a group of four hotels, described some of the hotels' amenities, and proposed a daily room rate, id. at 633-35.  In neither proposal did the HUBZone small business offeror indicate the number of rooms available at the hotels, include commitment letters, discuss its management of the reservation and reporting processes, set forth any information regarding its past performance or experience, or provide a signed Standard Form 1449 ("SF 1449").  Id. at 631-35.

Bluewater, in its Technical Approach volume, identified one primary hotel that could provide 150 rooms and one other hotel that could also provide 150 rooms, both of which were within a seven-mile radius of the LETC.  Id. at 487.  It indicated the ratings for both hotels; described how the hotels satisfied the room quality, amenity, cleanliness, safety and security, and parking requirements; and provided commitment letters from the hotels.  Id. at 487-92.  It also described how it would manage the reservation and reporting processes.  Id. at 486-87.  In its Performance Risk volume, Bluewater provided detailed information regarding three contracts that it had performed during the past five years with initial awarded values in the $3.9 to $18.9 million range.  Id. at 494-505.  Finally, in its Price volume, Bluewater proposed a daily room rate of [. . .] for the base year, a daily room rate of [. . .] for the option year, a price for the base year of [. . .], a price for the option year of [. . .], and a total price of [. . .].  Id. at 507.

## C.  Evaluation of Proposals

As set forth in the solicitation, the VA began the evaluation process by reviewing the proposals submitted by SDVOSBs (Tier 1).  It determined that two of the three Tier 1 proposals were "non-responsive" to the requirements of the solicitation.  Id. at 871-77.  One of the proposals did not (1) "address how the contractor will manage the administration" of the contract, (2) "identify standard quality measures (AAA Diamond rating, 1-5 Star Ratings, etc.[)] along with where the rating information was obtained (website, authority, etc.)," (3) "contain letters of commitment," or (4) timely submit a signed SF 1449.  Id. at 871-72.  In the other proposal, the offeror proposed lodging for "thirty (30) pre approved patients per night," rather than 300 LETC students per night.  Id. at 876.  The VA therefore determined that each proposal "represent[ed] an unacceptable response," id. at 871, 876, and eliminated the proposals from the competition, id. at 878-79.

The VA more fully evaluated the proposal submitted by Brian Hall.  Id. at 850-70.  It noted on an Individual Technical Evaluation Form that "Technical Approach will be evaluated against the following ratings":

| Rating | Definition |
|---|---|
| Excellent | The proposed approach indicates an exceptional and comprehensive understanding of the program goals, resources, schedules, and other aspects essential to the performance of the program.  The proposal contains strengths that should substantially benefit the program. There are no weaknesses or deficiencies.  The relative risk associated with the proposed approach is very low. |
| Good | The proposed approach indicates a thorough understanding of the program goals and the methods, resources, schedules, and other aspects essential to the performance of the program. The proposal contains strengths that should benefit the program. Weaknesses, if any, are offset by strengths.  There are no deficiencies.  The relative risk associated with the proposed approach is low. |
| Satisfactory | The proposed approach indicates an adequate understanding of the program goals and the methods, resources, schedules, and other aspects essential to the performance of the program. The proposal meets the minimum requirements of the solicitation; strengths or weaknesses may not exist. Any weaknesses are offset by strengths. There are no deficiencies. The relative risk associated with the proposed approach is moderate. |
| Marginal | The proposed approach indicates a superficial or vague understanding of the program goals and the methods, resources, schedules, and other aspects essential to the performance of the program. Weaknesses exist which are not offset by strengths. There are no deficiencies. The relative risk associated with the proposed approach is substantial. |
| Unsatisfactory | The proposed approach is insufficient and indicates a lack of understanding of the program goals and the methods, resources, schedules, and other aspects essential to the performance of the program.  Significant weaknesses and/or deficiencies exist.  The relative risk associated with the proposed approach is unacceptable. |

Id. at 850; see also id. at 25 (providing, in the VA's Acquisition Plan, that "[t]o receive consideration for award, a rating of no less than Satisfactory must be achieved in all technical related factors and sub-factors as stated in the solicitation").  It further indicated that the following definitions would be used to identify strengths, weaknesses, and deficiencies:

| | |
|---|---|
| Strength | Results in significant benefit to the Government; potential for significant positive impact on quality of products or services. |
| Weakness | A flaw in the proposal that increases the risk of unsuccessful contract performance. |

| Significant Weakness | A flaw in the proposal that appreciably increases the risk of unsuccessful contract performance. |
| Deficiency/Deficient | A material failure of the proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level. |

Id. at 850.

Rather than having each member of the Evaluation Team complete an independent evaluation, the Evaluation Team prepared a consensus evaluation of Brian Hall's proposal.  Id. at 851-65.  In assessing Brian Hall's "understanding of the requirement," the Evaluation Team addressed (1) "How the offeror will satisfy the lodging requirements," (2) "Cleanliness," (3) "Safety and security," and (4) "How the offeror will manage the administration/reporting process."  Id. at 851-62.  For the first criterion, the Evaluation Team examined four areas and assigned adjectival ratings to each:

- Hotel(s) proposed, Marginal

  . . . .  The vendor did not identify a primary facility.  The vendor identified 9 different hotels as primary.

  . . . .

  The vendor did submit commitment letters for 21 [sic] different hotels.  Of the 9 primary hotels that the vendor identified, 4 [sic] did not provide the quantity of rooms committed per instructions in the solicitation.  Furthermore, the vendors that did provide the number of rooms committed could not support the number of rooms that would be required for the VA LETC's lodging requirement.[7]

- distance from the LETC- Marginal

_____

[7]  There are two errors in this paragraph.  First, Brian Hall submitted twenty, not twenty-one, commitment letters.  See AR 210-48.  Second, five of the primary hotels did not identify the number of rooms committed:  four for which there were commitment letters, id. at 210, 212, 214, 216, and one—the [. . .]—for which there was not a commitment letter, see id. at 210-48.  Further, it is apparent that the Evaluation Team considered the commitment letter from the [. . .] in North Little Rock to be from the actual primary hotel identified by Brian Hall, the [. . .] in North Little Rock.

A search of google maps indicated that 1 of the 9 primary vendors does not meet that requirement.[8]

- AAA Diamond level, star level, etc.[]- Marginal

    Searching the 9 primary facilities offered in google yielded results that 4 of the 9 primary hotel[s] proposed are 3 star hotels and the remaining 5 are two star hotels.

- hotel amenities[]- Satisfactory

    Please see breakdown provide[d] below- Information obtained by Google Search, Google Map and inquiry to hotels to verify amenities offered.

Id. at 851-52 (footnotes added); see also id. at 853-61 (setting forth the results of the Evaluation Team's inquiry regarding the amenities offered by eight of the nine proposed primary hotels and reflecting that all eight provided the required amenities).  For the second criterion, the Evaluation Team stated that a site visit was not conducted; for the third criterion, the Evaluation Team observed that its inquiry revealed that all of the hotels have video surveillance but that Brian Hall did not address the topic in its proposal; and for the fourth criterion, the Evaluation Team indicated that three requirements were not addressed in the proposal and therefore were not met. Id. at 862.  The Evaluation Team then identified one strength, two significant weaknesses, and two deficiencies.[9]  Id. at 863.  The deficiencies were:

- Vendor did not list one primary location[] as requested.  Too many hotels listed as a primary venue.

- Vendor did not get room . . . commitment numbers from all vendors.

Id.

The Evaluation Team next addressed the feasibility of Brian Hall's approach, and concluded that the proposal did not meet the requirement because "[s]everal [hotels] did not provide number of rooms committed." Id. at 864.  It identified the number of proposed hotels as a strength and the lack of a primary hotel as a significant weakness. Id.  It also identified two deficiencies:

- Vendor did not ensure that the commitment letters all had the # of rooms committed listed.

---

[8]  The court entered the addresses in Google Maps and it appears that the Evaluation Team was using driving distance to determine which proposed hotels were within a seven-mile radius of the LETC.

[9]  One item was listed as both a significant weakness and a deficiency.  AR 863.

- The number of rooms committed on the letter of commitment were nominal and could not support the requirement for a primary venue and accommodate the number of students that would require offsite lodging.

Id.

Overall, the Evaluation Team assigned an Unsatisfactory technical rating to Brian Hall's proposal for the Technical Approach factor, id., explaining:  "The vendor did not fulfill the requirements requested in the solicitation as noted in the evaluation above, one primary location, incomplete commitment letters, failure to address quality assurance plans and deficiencies identified in the above ratings."  Id. at 865; see also id. (setting forth the definition for the rating of Unsatisfactory).

The VA also reviewed Brian Hall's Performance Risk volume.  Id. at 868-70.  On a Consensus Evaluation Worksheet, the VA indicated that three of the identified contracts were recent and of similar scope and complexity, but that they were "much smaller" than the VA's contract.  Id. at 868; see also id. at 1181 (indicating that the fourth contract was not evaluated because only three contracts were to be submitted).  It further noted that it received one Past Performance Questionnaire that was favorable to Brian Hall, with a "4 out of 5 rating,"[10] and was able to confirm from a search of the Federal Procurement Data System ("FPDS") that Brian Hall "does have the past performance experience with a number of agencies and does have experience in this type of requirement."  Id. at 869.  The worksheet does not include any ratings for the Performance Risk factor in general, or for experience or past performance in particular. Id. at 868-70.  However, subsequently prepared documents indicate that the VA assigned a Low Risk rating for Brian Hall's performance risk.[11]  Id. at 879 (competitive range memorandum), 1179, 1181-82 (Award Decision).

_____

[10]  The VA indicated that the Past Performance Questionnaire was received for contract 70LGLY20PGLB00343, AR 869, which was not a contract identified by Brian Hall in its proposal, see id. at 254-57, but according to the FPDS, is a contract awarded to Brian Hall, see U.S. Gen. Servs. Admin., Fed. Procurement Data Syst. – Next Generation, https://www.fpds.gov/ ezsearch/search.do?indexName=awardfull&templateName=1.5.1&s=FPDS.GOV&q=70LGLY2 0PGLB00343 (last visited Oct. 23, 2020) (providing search results for contract 70LGLY20PGLB00343).  In its subsequently prepared Best Value Determination and Award Decision ("Award Decision"), the VA indicated that the Past Performance Questionnaire was received for contract 70LGLY18PGLB00051, id. at 1181, which is not a contract awarded to Brian Hall, but likely is meant to refer to contract 70LGLY19PGLB0005, see infra Section II.B.2.d.  The Past Performance Questionnaire is not included in the administrative record, rendering it impossible to determine to which contract it pertains.

[11]  The Performance Risk rating definitions used by the VA were first revealed in the Award Decision.  See AR 1175-76.  In that document, a "Low Risk" rating was defined as: "Based on the Offeror's performance record, low risk exists that the Contractor will not successfully perform the required effort."  Id. at 1175.

With respect to Brian Hall's Price volume, it appears that the VA found the proposed price to be fair and reasonable, see id. at 879 (competitive range memorandum), 1182-83 (Award Decision), since it was only [. . .]% above the independent government cost estimate of [. . .] for the base and option years combined, id. at 1183. However, the administrative record lacks any contemporaneous documentation of the VA's review of Brian Hall's proposed prices.

### D.  Competitive Range Determination and Discussions with Brian Hall

On May 29, 2020, the contracting officer decided to establish a competitive range consisting of the sole remaining offeror in Tier 1:  Brian Hall.  Id. at 878-80.  In his supporting memorandum, the contracting officer remarked that Brian Hall "was evaluated and found to have an unacceptable Technical Approach, Low Risk Past Performance, and a Price determined to be higher than historical pricing, but still fair and reasonable."  Id. at 879.  He then wrote:

> [Brian Hall's] technical approach offered many strengths,[12] but had the following significant weakness and deficiency:
>
> Significant Weaknesses:  [Brian Hall] did not offer one primary location as requested.  With the number of hotels listed, miscommunication in the form of having the same student being assigned to more than one hotel can arise.  More time will have to be spent coordinating reservations.  For example, 300 students at 15 hotels would be 20 students per hotel versus having 300 students dispersed at three hotels.
>
> Deficiencies:  [Brian Hall] did not get all room numbers in commitment letters from all [hotels].  Without confirmation of the total commitment, Government cannot rely on [Brian Hall's] proposal to fulfill the need for rooms for "up to 300 students" per night.

Id. (footnote added).  But see id. at 863-64 (reflecting only two identified strengths).

In light of these findings, the contracting officer addressed what the next step in the competition should be:

> Under the tiered set aside, if the contracting officer determines that no SDVOSB proposal can meet the requirements of the solicitation at a fair and reasonable price, the Contracting Officer then dissolves the tier 1 restriction and evaluates

---

[12]  In its initial consensus evaluation, the Evaluation Team included only one bullet point as a "Strength" under "understanding of the requirement" and one bullet point as a "Strength" under "feasibility of approach."  AR 862-64.  For the former, the Evaluation Team noted that Brian Hall "seem[ed] to understand the administrative portions of the requirement" and then identified those portions that Brian Hall understood.  Id. at 863.  It appears that in his competitive range memorandum, the contracting officer considered each administrative portion understood by Brian Hall to be a separate strength.  See id. at 1180.

proposals received at the next tier.  However, the Contracting Officer may conduct discussions if determined to be in the best interest of the Government.

Id. at 879-80.  The contracting officer determined that Brian Hall was "the most highly rated proposal and neither of the remaining tier one proposals ha[d] a realistic chance for award, absent a material rewrite of the proposal—essentially starting over."  Id. at 880.  He further determined that Brian Hall

> could realistically[] be made an "excellent" or "good" technically rated proposal that represents best value to the Government, by reducing the number of hotels, and by providing signed commitment letters for all proposed hotels in its revised proposals.  At the same time, the pricing, while fair and reasonable, could be made even better through any available price reductions.

Id.  Consequently, the contracting officer established a competitive range "comprised of only Brian Hall" and declared that the VA would "conduct discussions with Brian Hall Properties with the intention of providing best value to the Government."  Id.  Moreover, the contracting officer indicated that

> [t]o maximize its ability to provide more advantageous pricing from hotel subcontractors (through confirmation of its standing in the competition), [Brian Hall] will be provided a letter from the Government informing it (and any prospective subcontractors it shares its letter with) that it is within the competitive range and therefore has a high likelihood of award.

Id.

The contracting officer sent a letter to Brian Hall on June 3, 2020, to advise the company that it was in the competitive range.  Id. at 883-85.  He identified the significant weaknesses and deficiencies of Brian Hall's proposal under the Technical Approach factor and asked Brian Hall to submit a revised proposal that addressed them.  Id. at 883-84.  He also asked Brian Hall to address the following price-related discussion point in the revised proposal:  "The pricing submitted by Brian Hall Properties is [. . .].  [. . .] the Government requests a price reduction for both the base and option period."  Id. at 885.  The contracting officer set a deadline of June 8, 2020, for Brian Hall's revised proposal.  Id. at 883.

Brian Hall submitted a revised proposal to the VA on June 5, 2020.  Id. at 886-1091.  It identified a primary hotel—[. . .] in North Little Rock—that could supply 135 rooms per day and "provide police security, 7 nights per week, to monitor this property and the overflow hotels."[13] Id. at 888-90.  It also provided commitment letters for twenty-one hotels, id. at 892-932, ten of which were, it declared, within seven miles of the LETC, see id. at 942 (revised Price volume).  Four of the commitment letters for those ten hotels included at least some information regarding

_____

[13]  In subsequently provided documents dated June 11, 2020, described below, neither Brian Hall nor the hotel indicated that the hotel was offering to provide security to monitor the overflow hotels proposed by Brian Hall.  AR 1097-98.

the hotel's amenities, although none mentioned hotel security.[14]  Id. at 892, 896, 900, 902.  In addition, Brian Hall reduced its proposed daily room rate to [. . .], its price for the base year to [. . .], its price for the option year to [. . .], and its total price to [. . .].  Id. at 942.

Four days later, on June 9, 2020, the contracting officer spoke with Brian Hall, id. at 1092-93,[15] and then sent Brian Hall a letter with the subject line "Brian Hall Properties Competitive Range Determination and Prospect for Award," id. at 1094.  The letter provided confirmation that Brian Hall was in the competitive range and was to be used by Brian Hall to assist its negotiations with hotels to "enhance its proposition."  Id.

Subsequently, on June 12, 2020, after submitting its revised proposal and after the stated deadline for filing a revised proposal, Brian Hall sent three additional documents to the VA.  Id. at 1095-107.  The first document was a letter from Brian Hall to the contracting officer dated June 5, 2020, that was similar, but not identical, to the June 5, 2020 letter that it included in its revised proposal.  Compare id. at 888 (June 5, 2020 letter on June 5, 2020), with id. at 1096 (June 5, 2020 letter sent on June 12, 2020).  Of note, this new June 5, 2020 letter provided that the [. . .] in North Little Rock "agreed to provide police security 7 nights per week to monitor this property and any neighboring overflow hotels."  Id. at 1096.  In addition, this letter indicated that Brian Hall was changing its revised price for the option year to [. . .] ([. . .] per night), and its total price to [. . .].  Id.

The second document was a letter from Brian Hall to the contracting officer dated June 11, 2020, thanking the contracting officer "for the opportunity to contact additional hotels and best [sic] determine the best venue for the VA's lodging requirement."  Id. at 1097.  It explained that it contacted other hotels, including some apparently suggested by the VA:  two belonged to a hotel group with a relationship with the LETC and refused to work with "outside parties" at that time; others "refused to offer more than 50 rooms on a night"; and "[t]he remainder of the suggested properties . . . refused to offer rooms [for] less than [. . .] per night."  Id.  Accordingly, it concluded that "the [. . .] in North Little Rock [was] the best location and value to the VA," especially since that hotel offered to provide additional security, including "an on duty police officer outside the hotel 24-hours a day, as well as 24-hour private security," if necessary.  Id.

The third document was an e-mail message from the chief executive officer of the [. . .] to Brian Hall confirming the security arrangements it was offering at its hotel and, implicitly, at three nearby hotels.  See id. at 1098 (reproducing an e-mail message from the hotel describing the security that would be provided on site, as well as a map on which the hotel, three other

---

[14]  A fifth commitment letter that may be from a hotel within a seven-mile radius of the LETC also included information regarding the hotel's amenities, AR 904, but that hotel was not one of the hotels identified in Brian Hall's revised Price volume, id. at 942.

[15]  The reference to the conversation appeared in an e-mail message from Brian Hall to the contracting officer, see AR 1092-93, but there is no contemporaneous documentation of the conversation prepared by the contracting officer in the administrative record.  Thus, it is not clear why the contracting officer communicated with Brian Hall after the deadline for Brian Hall to submit a revised proposal (and after Brian Hall submitted its revised proposal).

hotels, the county sheriff's office, and the city's police department—all within a few blocks of each other—are circled).

The VA apparently accepted and evaluated these three documents because their contents are referenced in the Award Decision, see id. at 1185, but the administrative record lacks any indication, aside from a vague reference to a conversation, of what prompted Brian Hall to submit the documents to the VA or why the VA accepted them.

### E.  Government Accountability Office Protest

On June 15, 2020, while discussions between the VA and Brian Hall were ongoing, Bluewater lodged a protest at the Government Accountability Office ("GAO") to challenge the VA's decision to enter into those discussions.  Id. at 1109-19.  It asserted:

> The agency's decision to exclusively enter into discussions with a vendor that failed to satisfy the requirements upon initial submission, to the exclusion of vendors, such as Bluewater, that complied with the Solicitation, renders the evaluation unreasonable.  The agency's deviation from its own stated tiered process to enter into what amounted to sole-source discussions is unreasonable.  But for the agency's unreasonable actions, Bluewater would have been in line for award.

Id. at 1109.  In a September 2, 2020 decision, the GAO agreed with the VA that on the record before it,[16] "Bluewater, a small business concern, [was] not eligible to compete in the same tier as Brian Hall, nor as a tier 2 competitor, and therefore lack[ed] the requisite direct legal interest to challenge the agency's actions with regard to tier 1 offerors."  Id. at 1163; accord id. (holding that as a Tier 3 offeror, Bluewater was "not in line for award").  It therefore concluded that Bluewater was not an interested party and thus dismissed the protest.  Id. at 1160, 1163-64.

### F.  Contract Award

Two days later, the VA contacted Brian Hall, after which Brian Hall provided confirmation that the [. . .] would be available beginning on October 1, 2020.  Id. at 1165.  Thereafter, on September 9, 2020, the VA sent Brian Hall the final contract.  Id. at 1166.  It was not until the following day, September 10, 2020, that the VA prepared and approved its Award Decision.  Id. at 1168-88.

In the Award Decision, the VA described its initial evaluation of Brian Hall's proposal, the establishment of the competitive range, and its discussions with Brian Hall.  Id. at 1177-85.

---

[16]  The record before the GAO included the protest letter, AR 1109-20; the parties' letter briefs, id. at 1121-45, 1154-59; a declaration from the contracting officer, id. at 1146-48; and a February 8, 2018 VA Procurement Policy Memorandum regarding the use of tiered evaluations, id. at 1149.  It did not include the identity or proposals of the other offerors.  Because the GAO's conclusion that Bluewater lacked a direct legal interest was based on an incomplete record, it lacks persuasive value in this proceeding.

It then, for the first time, described its evaluation of Brian Hall's revised proposal for the Technical Approach factor:[17]

> The Brian Hall Properties revised proposal submitted June 05, 2020 included the required letters of commitments for all hotels and reduced the number of primary locations to one, and reduced the number of hotels overall. Further, the primary hotel will have extra security provided.  The deficiency and significant weakness in the original proposal have been addressed and no longer exist.  As such, the technical approach rating changes from unsatisfactory to satisfactory.

Id. at 1185.  But see id. at 892-932 (reflecting that Brian Hall provided commitment letters for twenty-one hotels with its revised proposal, one more than it provided with its initial proposal). Also for the first time, the VA explained its Low Risk rating for Brian Hall's proposal on the Performance Risk factor:

> Brian Hall provided three references that all pertain to lodging services to a Federal Agency.  While all three are smaller in size, they are all relevant due to the scope and complexity that compares to the work outlined in the [Performance Work Statement].  The [Past Performance Questionnaire] provided also provides the Government confidence that Brian Hall provides quality services in the lodging arena.  Based on the Offeror's performance record, low risk exists that the Contractor will not successfully perform the required effort.

Id. at 1182; see also id. at 1175-76 (defining Low Risk to mean that "[b]ased on the Offeror's performance record, low risk exists that the Contractor will not successfully perform the required effort," providing that a Moderate Risk rating indicates a moderate risk of unsuccessful performance, and providing that a High Risk rating indicates a substantial risk of unsuccessful performance).  In addition, the VA asserted that Brian Hall reduced its proposed price in its revised proposal to [. . .] for the base year and [. . .] for the option year, observed that these proposed prices were lower than the independent government cost estimate, and remarked that although Brian Hall's original proposed price was "fair and reasonable, its revised lower price offer[ed] greater value to the Government."  Id. at 1185.

Based on its determination that Brian Hall, a Tier 1 offeror, submitted a proposal "with a satisfactory technical approach, low performance risk, and fair and reasonable price," the VA concluded that there was no need to evaluate the proposals from offerors in Tier 2 and Tier 3.  Id. at 1186.  Thus, the contracting officer found that the contract could be awarded to Brian Hall as its proposal "represent[ed the] best value to the Government."  Id. at 1187.

---

[17]  In its index to the administrative record, defendant identifies Tab 31 as the "Final Proposal Evaluation (June 12, 2020)," but Tab 31 is a one-page e-mail message, dated June 12, 2020, indicating that the LETC accepted Brian Hall's proposed hotel to lodge its students.  AR 1108.

The contract was executed on September 10, 2010, id. at 1194, 1196, with an effective date of November 1, 2020, id. at 1192, 1194, 1196.

### G. This Protest

The day before the VA sent Brian Hall the final contract, Bluewater filed a protest in this court challenging the VA's decision to conduct discussions with Brian Hall. Bluewater twice amended its complaint: once after the VA awarded the contract and again upon reviewing the administrative record. In its second amended complaint, Bluewater alleges three claims for relief: (1) that the manner by which the VA conducted discussions was inconsistent with the provisions of the solicitation; (2) that the VA erred in awarding the contract to Brian Hall despite Brian Hall submitting a technically unacceptable revised proposal; and (3) that the VA erred in awarding the contract to Brian Hall despite Brian Hall submitting a proposal demonstrating a high performance risk. Bluewater requests that the court issue a permanent injunction to enjoin the VA's award of the contract to Brian Hall, direct the VA to restart its evaluation of proposals starting with Tier 2 and adhere to the tiered evaluation approach described in the solicitation, and prohibit the VA from entering into discussions without first determining that it cannot make an award to any offeror in the relevant tier at a fair and reasonable price that provides best value to the government. It further requests awards of proposal preparation costs and attorneys' fees and costs.

Pursuant to a schedule they proposed, the parties briefed cross-motions for judgment on the administrative record and defendant's motion to dismiss, with briefing concluding on October 26, 2020. The parties represented that oral argument is unnecessary; consequently, the court is prepared to rule.

## II. DISCUSSION

### A. Defendant's Motion to Dismiss

As a threshold matter, defendant moves to dismiss Bluewater's protest for lack of standing.

### 1. Legal Standard

"[T]he question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." Warth v. Seldin, 422 U.S. 490, 498 (1975). In bid protests, standing "is framed by 28 U.S.C. § 1491(b)(1), which . . . imposes more stringent standing requirements than Article III" of the United States Constitution. Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009). Under § 1491(b)(1), bid protests may only be brought by "interested parties." Interested parties are those "actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." Am. Fed'n of Gov't Emps. v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (citing 31 U.S.C. § 3551(2)(A) (2000)).

Thus, "[t]o satisfy § 1491(b)(1)'s standing requirements, a plaintiff must make two showings." CliniComp Int'l, Inc. v. United States, 904 F.3d 1353, 1358 (Fed. Cir. 2018); see also Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992) (noting that the burden of establishing standing is on "[t]he party invoking federal jurisdiction"). First, it must demonstrate that it is an interested party, in other words, that it is an actual or prospective offeror with a direct economic interest in the award of (or failure to award) the contract. CliniComp Int'l, 904 F.3d at 1358. "Generally, to prove the existence of a direct economic interest, a [protestor] must show that it had a 'substantial chance' of winning the contract." Orion Tech., Inc. v. United States, 704 F.3d 1344, 1348 (Fed. Cir. 2013) (quoting Rex Serv. Corp. v. United States, 448 F.3d 1305, 1307 (Fed. Cir. 2006)).

A protestor must also show that it was prejudiced by the procuring agency's conduct.[18] Diaz v. United States, 853 F.3d 1355, 1358 (Fed. Cir. 2017); see also Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003) ("[B]ecause the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits."); Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002) ("[P]rejudice (or injury) is a necessary element of standing."). To demonstrate such prejudice, the protestor must show that "but for the error, it would have had a substantial chance of securing the contract." Labatt Food Serv., Inc. v. United States, 577 F.3d 1375, 1378 (Fed. Cir. 2009). "Although the inquiries may be similar, prejudice must be shown either as part of, or in addition to, showing a direct economic interest." CliniComp Int'l, 904 F.3d at 1358.

---

[18] A protestor must also demonstrate prejudice to succeed on the merits of its protest. See Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996) ("[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it."). The test for demonstrating prejudice at both the standing and merits stages of the protest is the same, but application of the test may yield different results due to the differing standards of review. See L-3 Commc'ns Corp. v. United States, 99 Fed. Cl. 283, 289 (2011) ("The difference between the two [prejudice standards] is that the prejudice determination for purposes of standing assumes all non-frivolous allegations to be true, whereas the post-merits prejudice determination is based only on those allegations which have been proven true."); Tech Sys., Inc. v. United States, 98 Fed. Cl. 228, 244 (2011) ("[S]ince, for purposes of standing, prejudice must be analyzed before a merits determination is made, it is more properly considered as a question of potential rather than actual prejudice, and assessed based on the cumulative impact of the well-pled allegations of agency error (which are assumed true at this juncture of proceedings)."). See generally Am. Relocation Connections, L.L.C. v. United States, 789 F. App'x 221, 225-26 (Fed. Cir. 2019) ("Whether a party has alleged an injury-in-fact (or prejudice) to establish Article III standing is distinct from whether that party can prove prejudicial error on the merits. . . . For standing, we presume the party bringing a bid protest will succeed on the merits of its claim and ask whether it has alleged an injury (or prejudice) caused by the procuring agency's actions.").

## 2. Bluewater Has Standing to Protest

There is no dispute that Bluewater submitted a proposal and therefore qualifies as an actual offeror. Rather, defendant contends that Bluewater lacks standing because it does not have a substantial chance of being awarded the contract. It observes that as a nonprioritized small business, Bluewater could prevail in the competition only if the proposals of Brian Hall, the Tier 2 VOSB offeror, and the Tier 3 HUBZone small business offeror were eliminated from the competition. According to defendant, "the existence of an offeror in a higher-prioritized set-aside category strips the non-prioritized protester of standing." Def.'s Cross-Mot. 9. The court disagrees with this broad statement.

First, the precedent that defendant relies upon in support of its statement is factually distinguishable. In those cases, or the cases those courts discuss, the contract was set aside for a single type of small business, and the protestors were not of that type. See Magnum Opus Techs., Inc. v. United States, 94 Fed. Cl. 512, 532 (2010) (relying on decisions in which the protestor had been declared "other than small," and thus lacked standing to challenge the award of a contract set aside for a small business); BlueStar Energy Servs., Inc. v. United States, 100 Fed. Cl. 607, 619-20 (2011) (remarking that had the protestor, which was found not to be an SDVOSB, been an actual or potential offeror, it would lack standing to challenge a solicitation for a contract that, in its view, should have had an SDVOSB preference); Int'l Mgmt. Servs., Inc. v. United States, 80 Fed. Cl. 1, 6-7 (2007) (holding that the protestor, which was not a small business, lacked standing to challenge the award of a contract set aside for a small business). In contrast, in this protest, the contract was set aside for an SDVOSB, VOSB, or small business (HUBZone, Section 8(a), or otherwise), and the VA invited proposals from each type of small business with the expectation that if it could not award a contract to an SDVOSB in the first tier, it would proceed through the lower tiers until it was able to do so.

Second, a protestor's standing is not contingent on whether it would receive the award if the procuring agency erred in awarding a contract to another offeror. Rather, a protestor has standing if it demonstrates—under both the direct economic interest and prejudice elements of standing—that it has a substantial chance of being awarded the contract if its allegations regarding the proposals of offerors who may be next in line for award are potentially meritorious. See, e.g., Hyperion, Inc. v. United States, 115 Fed. Cl. 541, 550 (2014) ("Hyperion has adequately alleged that the government erred in its evaluation of each of the other three proposals and improperly found them to be technically acceptable. If the government indeed erred in the ways Hyperion alleges, Hyperion would have received the award but for the errors."); Preferred Sys. Sols., Inc. v. United States, 110 Fed. Cl. 48, 58 (2013) ("It is because PSS's chance for award would not be insubstantial that the court is persuaded that the plaintiff has demonstrated that it has standing. Despite ranking fourth out of five offerors, PSS was in the competitive range and therefore within the zone of active consideration. More importantly, if, as PSS alleges, it should have received at least two additional strengths and the Price evaluation of [a competitor] were done properly, all of the agency's ratings would need to be redone, and a new best value determination made." (citation omitted)); cf. United States v. Int'l Bus. Machines Corp., 892 F.2d 1006, 1010-11 (Fed. Cir. 1989) (suggesting, with respect to a sealed-bid procurement in which the only difference among the bids is price, that a bidder that is not the second-highest bidder lacks standing to protest the contract award unless that bidder

"challenge[s] either the solicitation itself or the eligibility of the intervening bidders").  The fact that Bluewater may not ultimately prevail on the merits of its claims does not deprive it of standing to raise them in the first instance.  See Warth, 422 U.S. at 500 (remarking that "standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal").

Bluewater alleges that the VOSB offeror did not submit a compliant proposal and did not propose a fair and reasonable price.  With respect to proposal compliance, Bluewater remarks that the VOSB offeror did not, as required, submit a commitment letter that specified the number of rooms being offered or represent that it could supply 300 rooms, and notes that the VA rejected a Tier 1 offeror's proposal without discussions for failing to offer the required number of rooms.  Defendant responds that the hotels' management company's "agree[ment] to provide rooms at each hotel in support of LETC student lodging needs as per the agreed terms," AR 449, satisfied the solicitation's provisions, but fails to appreciate the solicitation's warning that merely stating that a "requirement will be met" does not suffice to render a proposal eligible for contract award, id. at 157.[19]  Thus, it is reasonable for Bluewater to assume that if the VA were applying the same evaluation standards in each tier, it would reject the VOSB offeror's proposal.  Moreover, Bluewater notes that the VOSB offeror's total proposed price was [. . .] independent government cost estimate.  While the proposed price might be reduced during discussions, it is not unreasonable to allege that the VA might ultimately determine that it was not fair and reasonable.

With respect to the HUBZone small business offeror, a review of its proposal reflects a number of deficiencies.  It did not submit separate Technical Approach, Performance Risk, Price, and SF1449/Certifications/Amendments volumes; it did not submit commitment letters; and it did not discuss its management of the contract.  It is readily apparent that the proposal was materially noncompliant with the solicitation requirements and that the VA was likely to reject it.  Thus, the proposal does not provide an obstacle to Bluewater having standing, and defendant's criticism that Bluewater did not address this particular proposal in the standing and prejudice arguments in its opening brief does not alter this conclusion.  Defendant's contention that a standing argument not raised in an opening brief is waived has been persuasively rejected in other decisions of this court.  See, e.g., Cyios Corp. v. United States, 122 Fed. Cl. 726, 733-34 (2015), aff'd, 674 F. App'x 1016 (Fed. Cir. 2017); CGI Fed. Inc. v. United States, 118 Fed. Cl. 337, 351 (2014), rev'd on other grounds and remanded, 779 F.3d 1346 (Fed. Cir. 2015).  Moreover, the court cannot turn a blind eye to the contents of the administrative record.  Accord 2M Rsch. Servs., LLC v. United States, 139 Fed. Cl. 471, 479 (2018) ("While this Court

---

[19]  Defendant criticizes Bluewater for relying on information gleaned from a hotel's website in support of its contention that one of Brian Hall's proposed hotels lacks the required amenities, see Def.'s Cross-Mot. 20; Def.'s Reply 8-9, but then relies on information it found on the websites of the hotels identified in Bluewater's proposal in support of one of its own arguments, see Def.'s Reply 9 & n.4.  Although the court would not rely on the results of its own research to resolve a dispositive issue and recognizing, in any event, that this issue is not dispositive, it notes that had defendant researched the two hotels identified by the VOSB offeror in the same manner it researched the hotels identified by Bluewater, defendant would have discovered that the two hotels had only 199 rooms between them—well below the 300 rooms required by the VA in the solicitation.  [. . .]

considers agency deference to be of the utmost importance, it cannot ignore the record before it.").

If the VA could not award the contract to the VOSB or HUBZone small business offerors, then it would have considered all of the remaining proposals in Tier 3 for contract award. Bluewater submitted a facially compliant proposal and proposed a price that was [. . .].[20] Because the VA would have performed a tradeoff analysis to determine the best value to the government, Bluewater would have a substantial chance of receiving the contract award, giving it a direct economic interest. Furthermore, Bluewater has established prejudice because but for the VA's purported errors in considering Brian Hall's proposal, Bluewater would have had a substantial chance of being awarded the contract. Consequently, Bluewater has standing to challenge the VA's contract award to Brian Hall.

### B. The Parties' Cross-Motions for Judgment on the Administrative Record

Turning to the merits of the protest, Bluewater and defendant have filed cross-motions for judgment on the administrative record. In ruling on such motions, "the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356 (Fed. Cir. 2005)). Because the court makes "factual

---

[20] Defendant contends that Bluewater's proposal suffers from the same deficiencies that Bluewater identifies in other proposals and therefore would be deemed noncompliant under its own standards. For example, defendant contends, Bluewater complains that the commitment letters included with Brian Hall's proposal lack descriptions of the hotel's amenities while failing to submit commitment letters with its proposal that include descriptions of amenities. Defendant misconstrues Bluewater's argument. Bluewater is not contending that a commitment letter was required to address the hotel's amenities (indeed, there is no such requirement in the solicitation). Rather, it contends that Brian Hall did not address in its Technical Approach volume whether each proposed hotel offered the required amenities and that only some of the commitment letters made up for that deficiency by including information regarding amenities. Moreover, Bluewater's contention is accurate: Contrary to defendant's assertion in its reply, Brian Hall's statement that it "worked diligently to exceed the basic requirements in the" solicitation, AR 889, does not satisfy the solicitation's requirement that an offeror address the amenities offered at all proposed hotels given the solicitation's warning that an unsupported statement that a "requirement will be met" does not suffice to render a proposal eligible for contract award, id. at 157.

Defendant further contends that Bluewater faulted Brian Hall and other offerors for inadequately addressing the security requirement even though it did not "demonstrate a 'low crime rate' in the areas where [its] hotels were located," as purportedly required in the solicitation. Def.'s Cross-Mot. 14 (quoting AR 122). Defendant's characterization of the solicitation is inaccurate. The "low crime rate" requirement in the solicitation related to contract performance, not proposal requirements. See AR 121-22 (including "low crime rate" in a table defining "the Performance Standards and Acceptable Performance Levels for Objectives associated with this effort").

findings . . . from the record evidence," judgment on the administrative record "is properly understood as intending to provide for an expedited trial on the administrative record." Bannum, 404 F.3d at 1356.

### 1. Legal Standard

The court reviews challenged agency conduct pursuant to the standards set forth in 5 U.S.C. § 706. 28 U.S.C. § 1491(b)(4) (2018). Specifically, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004). Under this standard, the court

> may set aside a procurement action if "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." A court reviews a challenge brought on the first ground "to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." "When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations."

Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citations omitted) (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332-33 (Fed. Cir. 2001)); accord Savantage Fin. Servs., Inc. v. United States, 595 F.3d 1282, 1286-87 (Fed. Cir. 2010) (providing that a protestor has the "burden of showing that the agency's decision . . . is so plainly unjustified as to lack a rational basis"); Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) ("The arbitrary and capricious standard . . . requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors.").

Procurement officials "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." Impresa, 238 F.3d at 1332 (quoting Latecoere Int'l, Inc. v. U.S. Dep't of the Navy, 19 F.3d 1342, 1356 (11th Cir. 1994)). Thus, the court's review of a procuring agency's decision is "highly deferential." Advanced Data Concepts, 216 F.3d at 1058; see also Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971) ("The court is not empowered to substitute its judgment for that of the agency."). Furthermore, when engaging in a negotiated procurement, a "protestor's burden of proving that the award was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law is greater than in other types of bid protests." Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004). And, when a contract is to be awarded on a "best value" basis, contracting officers have "even greater discretion than if the contract were to have been awarded on the basis of cost alone." Id. (citing E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996) ("Procurement officials have substantial discretion to determine which proposal represents the best value for the government.")).

In addition to showing "a significant error in the procurement process," a protestor must show "that the error prejudiced it." Data Gen., 78 F.3d at 1562; accord Bannum, 404 F.3d at 1351 (holding that if the procuring agency's decision lacked a rational basis or was made in violation of the applicable statutes, regulations, or procedures, the court must then "determine, as a factual matter, if the bid protester was prejudiced by that conduct"). "To establish prejudice . . . , a protester must show that there was a 'substantial chance' it would have received the contract award absent the alleged error." Banknote, 365 F.3d at 1350 (quoting Emery Worldwide Airlines, Inc. v. United States, 264 F.3d 1071, 1086 (Fed. Cir. 2001)); see also Data Gen., 78 F.3d at 1562 ("[T]o establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract."). The test for establishing prejudice "is more lenient than showing actual causation, that is, showing that but for the errors [the protestor] would have won the contract." Bannum, 404 F.3d at 1358.

## 2. Analysis

In its motion for judgment on the administrative record, Bluewater challenges two aspects of the competition:  the discussions conducted by the VA with Brian Hall and the VA's evaluation of Brian Hall's revised proposal.  Defendant responds in its cross-motion for judgment on the administrative record that Bluewater's challenges lack merit and requests the entry of judgment in its favor.  The court addresses each of Bluewater's contentions in turn.

### a. The VA Did Not Deviate From the Solicitation's Evaluation Scheme by Conducting Discussions With Brian Hall

Bluewater first contends that the VA deviated from the evaluation scheme set forth in the solicitation by opening discussions with Brian Hall—who it contends submitted a noncompliant proposal—before evaluating the proposals in Tier 2 and, if necessary, Tier 3, to identify a compliant proposal upon which an "award [could] be made at a fair and reasonable price that offer[ed] best value to the United States."  AR 156.  It further argues that the VA only reserved the right to conduct discussions if the contacting officer determined that discussions were necessary pursuant to FAR 52.212-1, and that the contracting officer did not make such a determination, instead stating only that discussions were in the best interest of the government.  In response, defendant argues that Bluewater's interpretation of the solicitation is incorrect and that the contracting officer was entitled to determine that discussions would be in the government's best interest.  The court agrees with defendant.

As an initial matter, the solicitation expressly allows for discussions to be held in conjunction with the evaluation of proposals within each tier.  FAR 52.212-1, which is reproduced in full in the solicitation, contemplates that discussions might be necessary before determining whether an award could be made, and the solicitation is unambiguous in providing that the VA would examine each tier independently to determine whether an award could be made to an offeror in that tier at a fair and reasonable price.

Moreover, nothing in the solicitation prohibited the VA from concluding that a not-fully-compliant proposal could be made compliant and, therefore, eligible for award, after discussions.

Indeed, as set forth in the FAR, discussions "are undertaken with the intent of allowing the offeror to revise its proposal," FAR 15.306(d), with the "primary objective of . . . maximiz[ing] the Government's ability to obtain best value," FAR 15.306(d)(2).  "At a minimum," the procuring agency must

> indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond.  The contracting officer also is encouraged to discuss other aspects of the offeror's proposal that could, in the opinion of the contracting officer, be altered or explained to enhance materially the proposal's potential for award.

FAR 15.306(d)(3).  In other words, the FAR expressly permits discussions to be held with offerors who submitted deficient proposals.

Bluewater's argument that the contracting officer's failure to analyze or determine that discussions with Brian Hall were "necessary" fares no better.  The VA clearly structured the competition to prioritize contract award to an SDVOSB, regardless of how many SDVOSBs submitted proposals.  See AR 156 (indicating that the contract would be awarded to a Tier 1 offeror if it could "be made at a fair and reasonable price that offers best value to the United States" or, if there was only one Tier 1 offeror, to that offeror "if the proposal meets the requirements of the solicitation and the proposed price is fair and reasonable").  And, as proclaimed in FAR 15.306(d)(2), discussions are meant to allow the government the opportunity to obtain best value by allowing offerors to address, among other items, significant weaknesses and deficiencies in their proposals.  The contracting officer, by declaring that discussions would assist the VA in achieving best value, AR 880, necessarily determined that discussions were "in the best interest of the Government," which sought to award the contract to an SDVOSB, and "necessary" because Brian Hall's proposal, as written, could not support a contract award.  Accord Progressive Indus., Inc. v. United States, 129 Fed. Cl. 457, 473 (2016) (rejecting the protestor's argument that "the VA did not comply with the FAR when it failed to document its reasons for holding discussions, after stating that it would it make the contract award(s) without discussions," because "the VA had reserved the right to conduct discussions" and "the VA did offer a rationale for the conduct of discussions when it established the competitive range" when it explained that "'the primary objective of . . . discussions was to maximize the Government's ability to obtain best value'" (quoting the VA's statement)).  Accordingly, the contracting officer's decision to engage in discussions with Brian Hall did not violate the provisions of the solicitation.

### b. The VA Did Not Treat Brian Hall's Proposal More Leniently Than it Treated the Proposals of the Other SDVOSB Offerors

Bluewater further argues that the VA treated the three SDVOSB offerors in Tier 1 differently, and had it applied the same standard to all three proposals, it would have rejected Brian Hall's proposal without conducting discussions.  Specifically, it observes that the VA rejected the proposals of two Tier 1 offerors as nonresponsive because they lacked "a realistic chance for award, absent a material rewrite of the proposal—essentially starting over," AR 880,

but then allowed Brian Hall to, in essence, materially rewrite its proposal via the discussions process.  Defendant does not specifically address this argument.  Nevertheless, the court finds it unpersuasive.

As an initial matter, the VA's use of the term "non-responsive" in its correspondence with the two unsuccessful SDVOSB offerors is misleading because responsiveness is a concept applicable in sealed-bid procurements conducted under FAR part 14, not negotiated procurements—such as this one—conducted under FAR part 15.  See Carahsoft Tech. Corp. v. United States, 86 Fed. Cl. 325, 341-42 (2009); Dyonyx, L.P. v. United States, 83 Fed. Cl. 460, 468 (2008).  It would have been more appropriate for the VA to declare the two proposals to be technically unacceptable.  See Carahsoft Tech., 86 Fed. Cl. at 341 ("[T]he concept of technical acceptability is roughly analogous to that of responsiveness in sealed bidding.").  Thus, the VA's rejection of proposals as "non-responsive" should be construed to mean that the VA found the proposals to be "unacceptable" because they did not "conform to the material terms and conditions of the solicitation . . . ."  E.W. Bliss Co., 77 F.3d at 448 (quoting Stocker & Yale, Inc., 70 Comp. Gen. 490, 493 (1991)).

A second difficulty with the VA's rejection of the two proposals as "non-responsive to the [solicitation] requirements" such that they constituted "unacceptable response[s]" is that the VA did not indicate whether the rejection was based on the cumulative effect of all of the identified deficiencies, or whether any one identified deficiency would have served as an independent basis for rejection.  The VA stated in the solicitation that the "[f]ailure to fully meet a material requirement" would render a proposal "unacceptable," but it did not explain what requirements it considered to be material.  However, because unacceptable elements of a proposal can be cured in a revised proposal, Carahsoft Tech., 86 Fed. Cl. at 342, a "material requirement" must be something clearly disqualifying (such as failing to submit a key element of a proposal—for example, a signed SF 1449 or commitment letters—or proposing to lodge thirty patients rather than 300 students).  See also Birch & Davis Int'l, Inc. v. Christopher, 4 F.3d 970, 974 (Fed. Cir. 1993) ("It is well established that a proposal must generally be considered to be within the competitive range unless it is so technically inferior or out of line as to price, as to render discussions meaningless." (quoting M.W. Kellogg Co./Siciliana Appalti Costruzioni, S.p.A. v. United States, 10 Cl. Ct. 17, 23 (1986))).

When Brian Hall's proposal is viewed in this light, it is apparent that its deficiencies did not rise to the level of immediately disqualifying.  Brian Hall submitted all required proposal volumes and all required documents within those volumes.  Although Bluewater identifies a number of ways in which Brian Hall did not satisfy the solicitation's requirements, those flaws could be remedied by a revised proposal after discussions.  Moreover, that a proposal might have a large number of flaws does not lead to the conclusion—drawn by Bluewater—that the offeror would need to materially rewrite its proposal to become acceptable and, thus, eligible for award.  Finally, there is no evidence in the administrative record indicating, as Bluewater argues, that but for the VA's independent inquiries regarding the hotels proposed by Brian Hall,[21] the VA would

---

[21]  Bluewater characterizes these independent inquiries as contrary to the provisions of the solicitation.  However, the VA reserved the right, "during evaluations," to "conduct site visits of any location proposed for lodging to determine [the] degree to which lodging requirements

have considered Brian Hall's proposal so deficient as to require its rejection for failure to fully satisfy a material requirement. Rather, the evidence suggests that the VA would not have made such inquiries had it found the proposal to be so unacceptable as to require rejection. See AR 876 (explaining to one of the unsuccessful SDVOSB offerors that if it "were to evaluate" the deficient proposal, "it would constitute a waste of Government resources").

In sum, Bluewater has not established that the VA treated Brian Hall's proposal more leniently than it treated the proposals of the other SDVOSBs in Tier 1.

### c. The VA's Evaluation of Brian Hall's Revised Proposal Deviated From the Solicitation's Evaluation Scheme

Bluewater next contends that the VA, upon evaluating Brian Hall's revised proposal, improperly assigned the proposal a Satisfactory rating for Technical Approach. Specifically, it asserts that Brian Hall did not, as required, address safety and security at its proposed secondary hotels or demonstrate that all of the hotels it proposed provided the required amenities.[22] In its response and cross-motion, defendant brushes Bluewater's contentions aside in five short error-laden sentences, and then reasserts some of those same inaccurate contentions in its reply.[23]

---

[could] be met." AR 157. If the VA was permitted to conduct a site visit to assess whether an offeror had satisfied the solicitation's lodging requirements, then it certainly could perform the same inquiries online or by telephone. The court therefore rejects Bluewater's challenges to the VA's inquiries.

[22] In advancing these arguments, Bluewater asserts that Brian Hall identified numerous hotels outside the permitted seven-mile radius. This assertion is based on the "miles" identified for each hotel in Brian Hall's initial and revised Price volumes. See AR 258, 942. However, it is unclear to what these "miles" refer; when the court used Google Maps to ascertain the as-the-crow-flies and driving distances between the hotels and the LETC, most of the results were significantly different than the "miles" identified by Brian Hall. See also supra note 5. And, although it appears that the Evaluation Team used driving distance when evaluating distance, see supra note 8, the "7-mile radius" language used in the solicitation suggests that an as-the-crow-flies measurement was originally contemplated. Under that interpretation, all but two of Brian Hall's secondary hotels satisfy the distance requirement. In contrast, only nine of the secondary hotels appear to be within a seven-mile driving distance. The court need not resolve the apparent ambiguities and inconsistencies, however, because its ultimate conclusion is not dependent upon such a resolution.

[23] Contrary to defendant's contentions, (1) Bluewater does not assert that information regarding amenities must be included in the commitment letters; (2) the amenities described in the solicitation's Performance Work Statement were required, not desired; (3) offerors were required to address the amenities provided at all of their proposed hotels in their Technical Approach volume; and (4) Brian Hall did not state, in its revised proposal, that it would provide police security at all twenty-one of its proposed hotels.

A review of all of the material that constitutes the Technical Approach volume of Brian Hall's revised proposal reveals that Brian Hall did not address the safety and security of most, if not all, of its proposed secondary hotels. See generally id. at 887-933, 1096-107. Indeed, under the most generous interpretation, Brian Hall addressed safety and security at only three of the secondary hotels. See id. at 1096-101. Moreover, the evidence in the administrative record reflects that when evaluating Brian Hall's initial proposal, the Evaluation Team ascertained, via its own inquiry, only that Brian Hall's nine primary hotels had video surveillance. Id. at 862. Of these nine hotels, seven are secondary hotels identified in Brian Hall's revised proposal, out of a total of twenty secondary hotels. Compare id. at 207 (initial proposal), with id. at 892-932 (revised proposal). And, there is no evidence that the VA revisited the issue of safety and security when evaluating Brian Hall's revised proposal. See id. at 1185. Thus, Brian Hall did not address, and the VA did not consider, safety and security for thirteen of Brian Hall's proposed hotels.

Turning to the required amenities, a review of all of the material that constitutes the Technical Approach volume of Brian Hall's revised proposal reveals that Brian Hall did not address the amenities available at sixteen of its proposed secondary hotels. See generally id. at 888-933, 1096-107. Moreover, the evidence in the administrative record reflects that when evaluating Brian Hall's initial proposal, the Evaluation Team ascertained, via its own inquiry, only that eight of Brian Hall's nine primary hotels provided all required amenities. Id. at 853-61. Of these eight hotels, seven are secondary hotels identified in Brian Hall's revised proposal, out of a total of twenty secondary hotels. Compare id. at 207 (initial proposal), with id. at 892-932 (revised proposal). And, there is no evidence that the VA revisited the issue of amenities when evaluating Brian Hall's revised proposal. See id. at 1185. Thus, Brian Hall did not address, and the VA did not consider, the amenities available at thirteen of Brian Hall's proposed hotels.

Consistent with the deference accorded to procuring agencies conducting negotiated procurements, when a protestor challenges a procuring agency's evaluation of a technical proposal, the court's "review . . . should be limited to determining whether the evaluation was reasonable, [was] consistent with the stated evaluation criteria and complied with relevant statutory and regulatory requirements." Banknote Corp. of Am. v. United States, 56 Fed. Cl. 377, 381 (2003), aff'd, 365 F.3d at 1345; accord E.W. Bliss Co., 77 F.3d at 449 ("[T]echnical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess."). Indeed, "the agency's technical evaluations must be consistent with the factors and procedures outlined in the solicitation. If an agency's evaluation of proposals differs significantly from the process disclosed in the solicitation, the agency's decision lacks a rational basis." Lab. Corp. of Am. Holdings v. United States, 116 Fed. Cl. 643, 650 (2014) (citation omitted).

As an initial matter, the VA advised offerors in the solicitation that it would evaluate their technical approach "to determine the extent to which [the proposal] meets or exceeds [the] lodging requirement" by assessing, among other things, how the offerors proposed to satisfy the hotel amenities requirement. AR 157. The VA did not assess how Brian Hall proposed to satisfy the requirement—set forth in the solicitation, id. at 119, 153—that each proposed hotel provide the required amenities. This deviation from the solicitation's evaluation scheme is

significant and thus renders the VA's evaluation unreasonable.[24]  But even if this deviation cannot be considered significant, it was not the only flaw in the VA's evaluation.

Pursuant to the ratings scheme adopted by the VA, to receive a Satisfactory rating for Technical Approach, a proposal must, among other things "meet[] the minimum requirements of the solicitation" and have "no deficiencies."  Id. at 850, 1175.  As noted above, upon evaluating Brian Hall's revised proposal, the VA changed the Unsatisfactory rating it initially assigned to Brian Hall's technical approach to a Satisfactory rating, explaining:

> The Brian Hall Properties revised proposal submitted June 05, 2020 included the required letters of commitments for all hotels and reduced the number of primary locations to one, and reduced the number of hotels overall. Further, the primary hotel will have extra security provided.  The deficiency and significant weakness in the original proposal have been addressed and no longer exist.  As such, the technical approach rating changes from unsatisfactory to satisfactory.

Id. at 1185.  The fact that Brian Hall addressed the significant weakness and deficiency in its original proposal does not negate the VA's obligation to ensure that the revised proposal satisfies the solicitation's minimum requirements as was necessary for it to assign a Satisfactory rating. And, the requirements of the solicitation are clear:  (1) offerors were to "address how [they] propose[d] to fulfil the lodging requirements of the [Performance Work Statement]," id. at 153; (2) the proposed hotels were to "meet the criteria for all areas shown on the technical checklist," id.; and (3) pursuant to the Performance Work Statement, hotels must provide certain, specified amenities and demonstrate the ability to provide for the safety and security of their guests, id. at 119-20.  Because Brian Hall did not address how all of its proposed hotels met all of the requirements described in the Performance Work Statement, the VA could not have concluded that Brian Hall's revised proposal "[met] the minimum requirements of the solicitation" such that a Satisfactory rating was appropriate.  Because a Satisfactory rating for the Technical Approach factor was a prerequisite for contract award, id. at 25, the VA's award of the contract to an offeror with a less-that-Satisfactory technical approach was arbitrary and capricious.

### d. The VA's Assessment of Brian Hall's Performance Risk, While Flawed, Was Not Arbitrary and Capricious

Bluewater also argues that the VA erroneously concluded that Brian Hall's proposal should be rated Low Risk on the Performance Risk factor.  It first contends that Brian Hall identified two contracts in its Performance Risk volume that it did not actually hold.  A comparison of the Performance Risk volume of Brian Hall's proposal, the VA's evaluation of

---

[24]  Because the court concludes that the VA did not properly evaluate whether all of the hotels proposed by Brian Hall offered the required amenities, it need not address Bluewater's contention that some of the hotels did not offer all of the required amenities.  Further, because the document with which Bluewater seeks to supplement the administrative record relates solely to its contention that one of the hotels proposed by Brian Hall did not offer all of the required amenities, the court denies Bluewater's motion to supplement the administrative record as moot.

that volume, and Brian Hall's contract information in the FPDS indicates that Bluewater's contention is an understandable consequence of Brian Hall's and the VA's sloppiness. First, it appears that for one of the contracts, Brian Hall used the wrong contract identifier, mistyping one digit. Compare id. at 254 (identifying contract 70LGLY18PGLB00051), with U.S. Gen. Servs. Admin., Fed. Procurement Data Syst. – Next Generation, https://www.fpds.gov/ezsearch/search. do?indexName=awardfull&templateName=1.5.1&s=FPDS.GOV&q=70LGLY19PGLB00051 (last visited Oct. 23, 2020) (providing search results for contract 70LGLY19PGLB00051). Second, for the other contract, the VA used the wrong contract identifier when querying the FDPS, also mistyping one digit. Compare AR 870 (providing information for contract 70LGLY18PGLB00048), with id. at 256 (identifying contract 70LGLY19PGLB00048), and id. at 870 (searching for contract 70LGLY19PGLB00048).

The FPDS reflects that Brian Hall was awarded the following three contracts (in the form of purchase orders): (1) 70LGLY19PGLB00051, awarded by the DHS FLETC, with a value of $47,553; (2) 70LGLY18PGLB00328, awarded by the DHS FLETC, with a value of $87,967; and (3) 70LGLY19PGLB00048, awarded by the DHS FLETC, with a value of $48,642. In other words, Brian Hall almost certainly was not intending to rely on contracts awarded to other entities. Moreover, the VA searched the FPDS and confirmed that Brian Hall had experience in the type of work being solicited. Thus, the mere misidentification of the two contracts is not grounds for setting aside the contract award.

Bluewater also contends that the VA erred in determining that the three contracts identified by Brian Hall were of similar scope and complexity as the contract that the VA planned to award. It observes that Brian Hall did not provide any narrative description of the three contracts that would allow the VA to determine their scope or complexity; specifically, there was no information regarding "the number of rooms provided, the amenities necessary, the administrative and managerial tasks required, or what portions of the work were similar or dissimilar to the [Performance Work Statement] for this procurement." Pl.'s Mot. 36. It further observes that the dollar value of the contracts, topping out at $87,967,[25] do not suggest that they were as complex as the VA's contemplated contract, which required, for an entire year, the provision of lodging for 300 students among several hotels at any given time. Based on these observations, Bluewater argues that the VA should have assigned Brian Hall's proposal a High Risk on the Performance Risk factor. Defendant does not address Bluewater's performance risk contention at all in its response and cross-motion, and merely states in its reply that "the record is replete with the experience Brian Hall Properties has at the [DHS] FLETC and similar facilities." Def.'s Reply 10.

The documents in the administrative record bearing upon the VA's evaluation of Brian Hall's performance risk, see AR 868-70, 1181-82, reveal that the evaluation was problematic in several respects. To begin, two of the three performance examples that the VA assessed were not contracts awarded to Brian Hall, and there is no indication that the VA recognized this fact. Rather, the VA appears to have evaluated Brian Hall's experience using these erroneous performance examples.

---

[25] One of the misidentified contracts had a value of $125,490, AR 870, but the VA did not consider that amount to be similar in size to the contract it planned to award, id. at 868, 1181.

Second, there is no indication that the VA, in the absence of any narrative description provided by Brian Hall regarding the nature of the contracts it used as performance examples (rather than its more general statements), looked beyond the information available in the FPDS to determine the scope and complexity of the contracts.  Rather, the VA appears to have relied on the basic information available in the FPDS (such as contract identifier, awarding agency, award type, award date, award amount, product/service code, and a less-than-250-character description of the requirement).  For the three performance examples it assessed (two of which were for contracts not awarded to Brian Hall), the VA would have learned from searching the FPDS that all three examples were purchase orders for "Transportation/Travel/Relocation-Travel/Lodging/ Recruitment:  Lodging, Hotel/Motel" services, as well as the following information likely to bear upon scope and complexity:

| Identifier | Initial Award Amount | Description |
|---|---|---|
| 70LGLY18PGLB00051 | $12,744 | IGF::OT::IGF OFF-CENTER LODGING FOR FLETC STUDENTS |
| 70LGLY18PGLB00328 | $87,967 | IGF::OT::IGF OFF-CENTER LODGING FOR FLETC STUDENTS |
| 70LGLY18PGLB00048 | $125,490 | IGF::OT::IGF OFF CENTER LODGING FOR ONE CLASS ARRIVING IN OCTOBER 2017. |

See U.S. Gen. Servs. Admin., Fed. Procurement Data Syst. – Next Generation, https://www.fpds. gov/ (last visited Oct. 23, 2020).  Or, if the VA viewed the entries for the three performance examples that Brian Hall presumably meant to be assessed, it would have learned that all three examples were purchase orders for "Transportation/Travel/Relocation-Travel/Lodging/ Recruitment:  Lodging, Hotel/Motel" services, as well as the following information likely to bear upon scope and complexity:

| Identifier | Initial Award Amount | Description |
|---|---|---|
| 70LGLY19PGLB00051 | $47,553 | Off center lodging requirements: this order is to lodge a class arriving in December. |
| 70LGLY18PGLB00328 | $87,967 | IGF::OT::IGF OFF-CENTER LODGING FOR FLETC STUDENTS |
| 70LGLY19PGLB00048 | $48,642 | IGF::OT::IGF OFF-CENTER LODGING FOR FLETC STUDENTS ADMINITRATIVE CHANGES, CLASS AND EARLY ARRIVAL CHANGES |

See id.  In either scenario, the FPDS lacked any information regarding the precise requirements of the contracts, such as the number of students to be lodged, the number of hotels to be used, or Brian Hall's administrative and management responsibilities.  Moreover, while such information

might have been included in the Past Performance Questionnaire that the VA received, the VA did not so indicate in its evaluation of Brian Hall's performance risk. Thus, it appears that the sole basis for the VA's conclusion that Brian Hall's three performance examples (whichever three were actually considered) were "relevant due to scope and complexity that compares to the work outlined in the [Performance Work Statement]" was its observation that the contracts were for the provision of hotel and lodging services for a federal agency.

Notwithstanding these issues, the court cannot say that a Performance Risk rating of Low Risk was inappropriate for Brian Hall. It is well settled that

> the determination of whether a particular example of past performance is relevant involves an exercise of discretion that lies particularly within the expertise of the procuring agency. The agency's subject-matter experts are best suited to determine whether and to what extent the experience reflected in a past performance example instills confidence that the offeror will successfully perform and meet the needs of the agency on the contract at issue.

Tech. Innovation All. LLC v. United States, 149 Fed. Cl. 105, 138 (2020) (collecting cases). The VA reviewed the information provided by Brian Hall, the information in the FPDS, and the contents of the Past Performance Questionnaire before concluding that a Low Risk rating—which reflected its conclusion that "low risk exists that [Brian Hall] will not successfully perform the required effort," AR 1175—was warranted. In other words, it did not have any evidence that there was a moderate or substantial risk that Brian Hall could not perform the work required under the contract. This assessment is entitled to deference. Moreover, the VA did not deviate from the evaluation scheme described in the solicitation: it considered Brian Hall's experience and performance record, see id. at 1181-82, and was entitled to look beyond the four corners of Brian Hall's Performance Risk volume to assess performance risk, id. at 158. Accordingly, the flaws in the VA's evaluation do not render the assignment of a Low Risk rating for the Performance Risk factor arbitrary and capricious.

### e. Bluewater Has Established Prejudice

Bluewater has established that the VA significantly erred in evaluating Brian Hall's revised proposal with respect to the Technical Approach factor. However, to prevail in its protest, Bluewater must further show that it was prejudiced by the VA's error. In other words, it must show that but for the alleged error, it would have had a substantial chance of being awarded the contract.

To demonstrate a substantial chance of being awarded a contract in the circumstances presented in this protest, Bluewater must establish, rather than allege, that the VA could not have awarded the contract to the VOSB offeror in Tier II or the HUBZone small business offeror in Tier III because if an award to either of those two offerors were possible, Bluewater's chance to receive the award would not be substantial. There can be no question that the VA could not have awarded the contract to the HUBZone small business offeror because its proposal was materially noncompliant with the solicitation requirements. See id. at 633-38. Furthermore, if the VA were to treat the proposal of the VOSB offeror in the same manner as it treated the proposals of the

SDVOSB offerors, then it would reject the VOSB offeror's proposal as noncompliant with the solicitation. Notwithstanding defendant's argument to the contrary, nowhere in its proposal did the VOSB offeror commit to supplying 300 rooms at one time, see id. at 433-53,[26] and the VA rejected an SDVOSB for committing to supply only 30 rooms, id. at 876.

With the proposals of the VOSB offeror and the HUBZone small business offeror eliminated from the competition, there would be no offerors remaining with priority over Bluewater. Thus, Bluewater would have competed for the contract with all of the other Tier 3 offerors. Because Bluewater submitted a facially compliant proposal and proposed a price [. . .], there was a substantial chance that the VA, after performing a tradeoff analysis, would have determined that Bluewater's proposal represented the best value to the government. Therefore, Bluewater has established prejudice.

### C.  Injunctive Relief

Because Bluewater has established the existence of a significant, prejudicial procurement error, the court must address whether Bluewater is entitled to injunctive relief. The United States Court of Federal Claims has the authority to award injunctive relief pursuant to 28 U.S.C. § 1491(b)(2), and is guided in making such an award by Rule 65 of the Rules of the United States Court of Federal Claims ("RCFC"). In determining whether to issue a permanent injunction, the court must consider whether (1) the plaintiff has succeeded on the merits; (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) the balance of hardships favors the grant of injunctive relief; and (4) it is in the public interest to grant injunctive relief. PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004). The protestor bears the burden of establishing the factors by a preponderance of the evidence. Lab. Corp. of Am. Holdings v. United States, 116 Fed. Cl. 643, 654 (2014); Textron, Inc. v. United States, 74 Fed. Cl. 277, 287 (2006). None of the four factors, taken individually, is dispositive, and a "weakness of the showing regarding one factor may be overborne by the strength of the others." FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993).[27] Conversely, "the absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors, to justify the denial" of injunctive relief. Id. The award of injunctive relief is within the discretion of the court. See Turner Constr. Co. v. United States, 645 F.3d 1377, 1388 (Fed. Cir. 2011) ("We give deference to the Court of Federal Claims' decision to grant or deny injunctive relief, only disturbing its decision if it abused its discretion.").

Bluewater has succeeded on the merits of its protest. Therefore, the court turns to the remaining injunctive relief factors.

---

[26] Indeed, as noted above, the VOSB offeror identified two hotels in its proposal and stated only that [. . .].

[27] Although FMC Corp. concerns the award of a preliminary injunction, 3 F.3d at 427, "[t]he standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success," Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 546 n.12 (1987).

### 1. Irreparable Injury

With respect to the irreparable injury factor, "[t]he relevant inquiry . . . is whether plaintiff has an adequate remedy in the absence of an injunction." Magellan Corp. v. United States, 27 Fed. Cl. 446, 447 (1993); see also Younger v. Harris, 401 U.S. 37, 43-44 (1971) (noting that "the basic doctrine of equity jurisprudence [is] that courts of equity should not act . . . when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief"). Bluewater contends that it has been harmed absent a permanent injunction because it is losing both the profits it could have earned on the contract and experience and capabilities that it would have received by performing the contract.

This court has recognized that a lost opportunity to compete for a contract—and the attendant inability to obtain the profits expected from the contract—can constitute irreparable injury. See, e.g., Akal Sec., Inc. v. United States, 87 Fed. Cl. 311, 319 (2009); Hosp. Klean of Tex., Inc. v. United States, 65 Fed. Cl. 618, 624 (2005), cited in Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1383 (Fed. Cir. 2012); see also Serco Inc. v. United States, 81 Fed. Cl. 463, 501-02 (2008) (observing that when "the only other available relief—the potential for recovery of bid preparation costs—would not compensate [the protestors] for the loss of valuable business," such a "loss, deriving from a lost opportunity to compete on a level playing field for a contract, has been found sufficient to prove irreparable harm"). Similarly, the loss of experience resulting from a lost opportunity to compete for a contract can constitute an irreparable injury. See, e.g., Palantir USG, Inc. v. United States, 129 Fed. Cl. 218, 293 (2016), aff'd, 904 F.3d 980 (Fed. Cir. 2018).

Normally, attorney argument is insufficient to establish an irreparable injury. See, e.g., Intelligent Waves, LLC v. United States, 135 Fed. Cl. 299, 314 (2017); Totolo/King v. United States, 87 Fed. Cl. 680, 693 (2009), appeal dismissed and remanded sub nom. Totolo/King Joint Venture v. United States, 431 F. App'x 895 (Fed. Cir. 2011) (per curiam); Ashbritt, Inc. v. United States, 87 Fed. Cl. 344, 367 (2009). However, as the incumbent contractor, Bluewater likely submitted a proposal with the expectation of making a profit (as opposed to submitting a lower-priced offer to gain a toehold in the industry), and there can be no dispute that a lost opportunity to compete for a contract forecloses a contractor's ability to gain the experience associated with performing the contract, which has value when competing in future procurements. Consequently, Bluewater has established irreparable injury.

### 2. Balance of Harms

In addition to considering whether a protestor would suffer an irreparable injury absent a permanent injunction, "the court must weigh the irreparable harm plaintiff would suffer without an injunction against the harm an injunction would inflict on defendant . . . ." Progressive Indus., 129 Fed. Cl. at 485. Bluewater contends that the VA's sole interest is to ensure that it can provide student lodging for the LETC, and that if the court issued a permanent injunction, the VA could use other means to provide the lodging (such as allowing continued performance by the incumbent) while it proceeds with its evaluation of proposals. Because the VA would not be

harmed by an injunction, Bluewater argues, the balance of harms tips in its favor.  The court
agrees.

### 3.  Public Interest

Finally, when "employing the extraordinary remedy of injunction," a court "should pay
particular regard for the public consequences" of doing so.  Weinberger v. Romero-Barcelo, 456
U.S. 305, 312 (1982).  There is no dispute that "[t]here is an overriding public interest in
preserving the integrity of the procurement process by requiring the Government to follow its
procurement regulations."  Bona Fide Conglomerate, Inc. v. United States, 96 Fed. Cl. 233, 242
(2010).  Although "there is a countervailing public interest in minimizing disruption" to the
procuring agency, Heritage of Am., LLC v. United States, 77 Fed. Cl. 66, 80 (2007), defendant
has not explained how the VA would be disrupted by properly evaluating the proposals in this
procurement.  Rather, defendant mischaracterizes Bluewater's protest as an attempt to block the
VA's use of a tiered set-aside, and maintains that there is a public interest in seeking to award a
contract to "favored offerors from prioritized socioeconomic categories."  Def.'s Cross-Mot. 20.
But a permanent injunction would neither terminate the tiered set-aside crafted by the VA nor
disturb the VA's contracting preferences.  Accordingly, the court finds that the public interest
weighs in Bluewater's favor.

### 4.  Summary

In addition to prevailing on the merits of its protest, Bluewater has established that it will
suffer irreparable harm if the court withholds injunctive relief, that the balance of harms tips in
its favor, and that an award of injunctive relief is in the public interest.  Thus, the issuance of a
permanent injunction is warranted.

### III.  CONCLUSION

For the reasons set forth above, the court **DENIES** defendant's motion to dismiss,
**GRANTS** Bluewater's motion for judgment on the administrative record, and **DENIES**
defendant's cross-motion for judgment on the administrative record.  Bluewater is entitled to
injunctive relief.  Specifically, the court **ENJOINS** the VA from continuing performance on the
contract awarded to Brian Hall pursuant to the solicitation at issue in this protest, **DIRECTS** the
VA to cancel the contract awarded to Brian Hall, and further **DIRECTS** the VA to select a new
awardee by proceeding with its evaluation of proposals, starting with the Tier 2 proposals, in
accordance with the provisions of the solicitation.  Further, the court awards costs to Bluewater
pursuant to RCFC 54(d).  The clerk shall enter judgment in favor of Bluewater, consistent with
this opinion.

The court has filed this ruling under seal.  The parties shall confer to determine agreed-to
proposed redactions.  Then, by **no later than Friday, November 13, 2020**, the parties shall file a
joint status report indicating their agreement with the proposed redactions, **attaching a copy of**

those pages of the court's ruling containing proposed redactions, with all proposed redactions clearly indicated.

**IT IS SO ORDERED.**

<u>s/ Margaret M. Sweeney</u>
MARGARET M. SWEENEY
Senior Judge